# SUPERIOR COURT OF BALTIMORE CITY

Filed November 24, 1893.

## STATE OF MARYLAND
### VS.
## THE SUPREME COURT OF THE EQUITABLE LEAGUE OF AMERICA OF BALTIMORE CITY.

*Attorney-General John P. Poe* for plaintiff.

*Bernard Carter, George R. Willis* and *Frank V. Rhodes* for defendant.

HARLAN, C. J.—

This is a proceeding by the State of Maryland to ascertain whether the defendant corporation has been guilty of such misuse, abuse or non-use of its corporate powers and franchises as by law would authorize and make proper the forfeiture of its charter. The proceedings are regulated by Sections 255 to 263 of Article 23 of the Code of Public General Laws. By Section 258 it is provided that "if the Court shall be of opinion that legal cause of forfeiture has been shown *and the public interests require that the said forfeiture shall be declared,* a decree of forfeiture shall be entered * * * and the Court shall thereupon appoint a receiver or receivers of the estate and assets of said corporation." By Section 260 it is declared that if the Court "shall be of opinion that no cause of forfeiture has been shown, *or that the public interests do not demand that such forfeiture shall be decreed, even though legal cause therefor has been shown,* it shall dismiss the petition and award costs in favor of the corporation proceeded against, and if the Court shall determine that legal cause of forfeiture has been shown, *it may in its discretion,* before passing a final decree of forfeiture pass orders requiring the cor-

poration, within a time to be therein fixed, to remedy the grievance complained of, and may suspend the passage of the final decree of forfeiture until the time so fixed, and may afterwards refuse to pass such decree, *if the grievance shall have been remedied by the time so fixed.*"

The cause of forfeiture alleged in the original petition filed on January 10, 1893, was that the defendant was doing an insurance business without complying with the insurance laws of the State. The answer of the defendant did not deny this. It claimed, however, that defendant's failure in this behalf was not intentional or willful, but was the result of a *bona fide* belief that it was exempt from the requirements of the insurance laws because of having ritualistic work or ceremonies in its lodges, councils or societies, and of information received from the Insurance Department that it did not come within the provisions of said insurance laws, and asked to be allowed to continue its business upon submitting itself to the provisions of the insurance laws and doing all things by said insurance laws required to be done.

To this answer the State demurred, and thereupon and thereafter the Court, upon the 11th day of April, 1893, in pursuance of the authority and discretion given by Sec. 260, hereinbefore referred to, passed an interlocutory order, assented to by the Attorney-General, whereby after reciting that the Court is of "opinion that the public interests do not demand that a decree of forfeiture should be passed against the defendant if it shall comply with the terms hereinafter mentioned," it is ordered:

1. That the defendant forthwith file with the Insurance Department the statement and report required by Art. 43 of the Code, and contained in defendant's exhibit No. 4.

2. That within thirty days from April 11, 1893, the defendant make such payments and deposits as are required by the laws of Maryland to be made by insurance companies conducted on the plan of the defendant.

3. That if the charter and amended charter should be found by the Attorney-General to be in proper shape, that they be endorsed by him with his approval and recorded and certified copies filed with Insurance Department.

4. That upon the filing by the defendant in this case of a certificate from the Insurance Commissioner showing that it had done the things required then the Court would in the exercise of the power conferred by Sec. 260 of Art. 23 of the Code, pass a decree dismissing the petition.

On July 26, 1893, a petition for further proceedings was filed by the Attorney-General, alleging that the defendant had failed to comply with the interlocutory order of April 11, 1893, in that it had not made the payments and deposits which it was ordered to make, and asking in view of a changed condition of the affairs of the defendant, therein particularly detailed, that the defendant be no longer permitted to comply with the order of April 11, 1893, and the cause regularly proceeded with to end that a judgment of forfeiture be entered. This petition was answered by the defendant on August 3, 1892, admitting that no payments and deposits had been made with the Insurance Commissioner, but alleging that the only reason why full compliance with this order of the Court had not been made was the failure of the Insurance Commissioner to act in the premises as his duty required, expressing continued willingness to comply with the order and denying generally that there was any such changed condition of its affairs as would justify the Court in forfeiting its charter.

On August 8th, 1893, issue was joined upon the matters alleged in the answers so far as they denied or avoided the allegations of the petitions, and the taking of testimony was begun before the standing commissioner of this Court; it being agreed by the counsel of the respective parties that the case should be heard by the Court upon the pleadings and the testimony to be taken which was begun on the 9th day of August, 1893.

During the progress of taking testimony the Attorney-General on August, 1893, filed a petition setting forth that, although the original charter of the defendant granted in 1885 provided only for mortuary and disability insurance, it appeared from the testimony already taken that from the beginning of its operations on October 1, 1886, it unlawfully issued endowment

policies, upon the assessment plan, for the sum of one thousand dollars each, and continued to issue such policies up to the time when its charter was amended, on April 23, 1889, to the number of seventeen hundred. The petition further alleged that these policies were null and void as being *ultra vires* and incapable of ratification; that after the adoption by the defendant of its amended charter in April, 1889, whereby for the first time it became authorized to issue endowment policies; it issued other endowment policies, not for an absolute sum of one thousand dollars, but for a sum *not exceeding one thousand dollars*, thus creating an unjust discrimination between the two classes of policies. The petition further alleged that these void policies would begin to mature on October 1st, 1893, seventy-five amounting to $63,-400, maturing in October, November and December, 1893; two hundred and seventy-three amounting to $255,800, maturing in 1894; all' of which if continued in force the Supreme Court of the defendant purposed to pay as they should mature, less sick benefits properly deductible therefrom, that the total policies outstanding amounted to about $4,700,000, or which $800,000 would mature in 1895, while the result of seven years' operations had enabled the defendant to accumulate less than $300,000; that these figures demonstrated the hopelessness of the scheme to pay all these policies as they should mature. The petition further alleged that the accession of new members, upon which the success of all such schemes depend had ceased, public confidence in the order was at an end; that members were dropping out, the net loss within the prior eighteen months being about 600; that widespread dissentions, dissatisfaction and discontent existed in the order and its supreme body, that an increase of assessments would result in compelling other members who could least afford it to lapse; and that unless the affairs of the order were speedily wound up the funds on hand together with those to be counted from assessments, would be absorbed or nearly absorbed in paying the seventy-five certificates maturing in 1893, and the two hundred and seventy-three (273) certificates maturing in 1894, leaving comparatively nothing for the great body of the membership whose certificates would mature

in 1895, and subsequent years, and that so great a practical injustice ought not to be permitted. The petition asked an order restraining the defendant from paying any certificates pending this suit, and an *order nisi* was accordingly passed.

This petition was answered by the defendant on August 28, 1893, denying that the certificates issued prior to the amendment of its charter were null and void, but on the contrary claiming that they were valid and legal, also denying any unjust discrimination between the two classes of policies, asserting that the contract contained in each was the same, and denying generally or confessing and avoiding the other allegations of the petition. On September 13, 1893, the *order nisi* was made final, restraining the paying of any certificates until the further order of the Court. Subsequently, on October 6, 1893, the Attorney-General to avoid the objection that the only cause of forfeiture that could be relied upon, was that stated in the original petition, asked and obtained leave to file an amended and supplemental petition, wherein are incorporated fully all the allegations which can be regarded as causes of forfeiture contained in the original petition, the petition for further proceedings and the petition for an order restraining the payment of the maturing certificates.

This amended and supplemental petition was filed on October 7th, 1893, and prays that the interlocutory order of April 11th, 1893, may be stricken out; that the defendants shall not now be permitted to comply with its provisions; that the restraining order of September 13, 1893, shall be made perpetual, and that the charter of the defendant corporation shall be vacated and annulled as prayed, and a receiver appointed. The defendant answered on October 21, 1893, and the State replied on October 23, 1893, joining issue on all those parts of the answer which traverse the allegations of the petition; denying all new matter set up by way of confession and avoidance, and especially denying that the Insurance Commissioner ever informed defendant that it did not come under the provisions of the Code relating to insurance companies, or that the Insurance Commissioner ever informed the defendant that when he was ready to

receive the deposit required by law he would notify the defendant.

The issues having been thus made up the case was submitted to the Court by agreement upon the pleadings, testimony and exhibits, after full and able argument by counsel. The Attorney-General has submitted the propositions of law upon which he relies in the form of prayers. The review of the pleadings that I have given makes it apparent that the burden of establishing such facts are alleged in extenuation of the failure of the defendant to comply with the interlocutory order rests upon the defendant. This burden has not been met; even giving effect to the extension of time granted by the Insurance Commissioner without the sanction of the Court until the decision by the Court of Appeals in the Mason case, it appears that for more than a month after that decision had been made public there was no attempt made to comply with the Court's order. But the defendant insists that it would be altogether too harsh to forfeit its charter for this default, and that it ought to be still permitted to go on and make the required payment.

If the case made were the same as that made at the time of the passage of the interlocutory order this suggestion would be entitled to much more weight, but a very different state of facts with regard to the defendant is now presented to the Court for the first time, and this being so it seems to me that we must treat the case from the standpoint that a cause of forfeiture exists and endeavor to determine whether the public interests require that the forfeiture should be decreed. The third and fourth prayers of the State which respectively declare that *the Court may lawfully proceed* to dissolve the defendant corporation if it has been and still is engaged in the business of mortuary, disability or endowment insurance, without having made the deposit required by law, and that *the Court may lawfully proceed* to dissolve the defendant corporation if it has not fully complied with the terms and conditions of the interlocutory order of April 11, 1893, should accordingly be granted; and there being no dispute about the facts upon which these prayers are hypothecated the question is, *shall the Court proceed* to dissolve the corporation? What do the public interests demand? Upon this question the facts hypothecated in the sixth, eighth and ninth prayers of the State have a material bearing.

The testimony makes it clear that from whatever cause, whether as the result of litigation or the general disfavor in which orders of this kind are held at present, or inherent weakness in its plan or scheme, internal dissentions among the members and officers, great discontent and loss of confidence in the stability of the order, do exist. I am satisfied, also, from the proof that a very large majority of the members of the order desire that it shall be dissolved and a just distribution of the assets made. Whether under the true interpretation of the obligations of the defendant as established by the certificates of membership taken in connection with the constitution and by-laws of the order, defendant's contract with its members is, not that it will pay its members their certificates as they mature, but that it will establish a relief fund by assessments on its members and to the extent that this fund is sufficient, will pay the members holding its certificates at the end of seven years a sum not exceeding the amount specified therein, and that therefore, as contended on behalf of the defendant, it is impossible to predicate the defendant insolvency, present or future, I do not stop to inquire, because I think it is shown that unless the order is able to do what it alleges that it always contemplated being able to do, and for which it was formed, and upon the hopes of which its membership was built up, to wit: pay its certificates in full as they mature, its continuance must result in great inequality, injustice and hardship to the bulk of the membership. Nor will it do, when the application is made by the State to say, that the Court has nothing to do with relieving people who have in the expectation of speculative gains made improvident contracts. If the Court finds that the State's creature has abused the franchises conferred upon it, it may assuredly take into consideration the effect of the further continuance of these franchises upon a large number of its citizens, even though they have been improvident or foolish, in an application by the sovereign to have the franchises revoked. If the earlier maturing cer-

tificates are to be paid in full, and the later certificates are only to be paid in part, or only paid in full after the holders have been compelled in order to prevent lapsing, to contribute by assessments a much greater sum than that paid by the earlier maturing certificate holders, this inequality is at once manifest, particularly as the number of certificates to mature increase each year in proportion as the membership has grown, and the number of persons interested in the later certificates is much larger than those interested in the earlier certificates. It is shown by the exhibits that seventy-six certificates mature in 1893, two hundred and seventy-three in 1894, over eight hundred in 1895, over seven hundred in 1896, over seven hundred in 1897, over six hundred in 1898, and over five hundred in 1899. The testimony shows that the net result of the operations of the defendant company during the past seven years, during which time no certificates matured, and the only liabilities which it has had to meet were the ordinary claims for sick benefits which presumably will continue proportionately, has been the accumulation of $300,000. Today the order stands upon the threshhold of the period when it will have to begin paying maturing certificates, and within the next seven years it has certificates maturing which amount to $4,-700,000. Now is there any reasonable probability that it will be able to meet these certificates as they fall due and pay them in full? The sources from which the money to do so is to be derived are: (1) profits on lapses of members who, by failure to pay assessments, forfeit all that they have contributed; (2) money derived from the constant accession of new members; (3) interest on invested funds, and (4) assessments upon members. The proofs shows that the expected profits from lapses of members have not been realized; on the contrary, the members who have lapsed have taken out in sick benefits more than they have paid in; that the accession of new members has almost, if not entirely, ceased, and the last eighteen months has resulted in a new loss of over six hundred. The interest accumulations can do but little towards providing the large sum of money needed, and the order is compelled to fall back upon the asserted power of unlimited assessment. The

result of increasing the number of annual assessments will be both to cause a large number of members to lapse and to require those holding the later certificates to pay, in order to realize anything upon their certificates, a sum largely in excess of that paid by the holders of the earlier matured certificates.

On the 26th of July, 1893, a circular (Exhibit G. G. H.) was sent to each of the 400 members of the order, accompanied by a statement prepared by Mr. John T. Owen, one of the members of the Finance Committee, and signed by him and Mr. R. B. Laroque, another member of the committee, which statement the circular declares "fully establishes the fact that the order is in most excellent condition and able to maintain itself without any burdensome assessment of its members till January 1st, 1895, and then be in better condition to carry on its work than it is today." The circular appeals to the members to reply at once, giving an expression of their desire to maintain the order in its usefulness. The Chief Justice over his signature certifying this as a truthful exhibit of the affairs of the order particularly requests the members to reply, expressing their confidence in the order. The fact that to this circular but ninety replies were received opposing liquidation, representing but nine subordinate Courts, speaks plainly as to the sentiment of the majority of the members. The author of the statement accompanying the circular, Mr. John T. Owen, when examined as a witness, very frankly states that this circular was intended to be something in the nature of a calculation of what might be done under favorable circumstances; that he did not believe, as a matter of fact at the time of testifying, that the figures given could be worked out, and in his opinion that the only thing left to be done, and what ought to be done, in justice to all the members, was to go into liquidation and divide the assets *pro rata*. The other gentlemen who signed the statement, Mr. R. B. Laroque, when these statements of Mr. Owen were read to him, expressly agreed with them. The third member of the Finance Committee, Mr. Newton T. Hall, and its chairman, refused to sign this statement in the beginning, prepared one of a very different tenor,

and is of opinion that the order cannot maintain itself and continue to carry on its operations successfully. The facts being such as I have noted, and such being the opinion entertained of the condition of the defendant by its chief financial officers, it seems to me that certainly there is no public interest to be served by allowing it to continue; on the contrary, it would seem that in the interest of equality, equity and fair dealing, in the interest of the many as contra-distinguished from the interest of a few, that the Court ought not to hesitate to declare that this corporation, which from the beginning has failed to comply with the insurance laws of the State, should not further continue its operations; entertaining this view of the case, I shall grant the sixth, eighth and ninth prayers of the State, and am prepared to sign a decree in accordance with this opinion, forfeiting the charter of the defendant and appointing a receiver to take charge of and distribute its assets. The propositions involved in the other prayers of the State I have not deemed it necessary to decide.